FILED

Aug 31 2016, 8:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



| ATTORNEYS FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Paul T. Deignan | Jay Jaffe |
| R.C. Richmond, III | Brian J. Paul |
| Taft Stettinius & Hollister LLP | Faegre Baker Daniels LLP |
| Indianapolis, Indiana | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| George P. Broadbent, and Plainfield Village, LP,[1] | August 31, 2016 |
| *Appellants-Defendants,* | Court of Appeals Case No. 32A01-1602-MF-345 |
| v. | Appeal from the Hendricks Superior Court |
| Fifth Third Bank, | The Honorable Rhett M. Stuard, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 32D02-1408-MF-307 |

**Kirsch, Judge.**

---

[1] Plainfield Village, LP has not appeared or participated in this appeal, but we include it in the caption because all parties of record in the trial court are parties on appeal. Ind. Appellate Rule 17(A).

George P. Broadbent ("Broadbent" or "Guarantor") appeals the trial court's entry of summary judgment in favor of Fifth Third Bank ("the Bank" or "Lender"). He raises two issues on appeal, which we restate as:

> I. Whether the trial court erred when it determined that the two payment guaranties that Broadbent signed were not ambiguous; and

> II. Whether the trial court properly calculated Broadbent's liability under the guaranties.

We affirm.

## Facts and Procedural History

This case stems from two loans that the Bank issued to Plainfield Village, LP ("Plainfield Village" or "Borrower") for purposes of real estate development, namely the construction of a shopping center. On June 30, 2006, the Bank loaned Plainfield Village the following amounts: (1) $7,450,000.00 ("Construction Loan") and (2) $1,307,000.00 ("Additional Loan") (together, "the Loans" or "the Notes"). Both Loans were backed by collateral, including a mortgage on real estate, which Plainfield Village gave to the Bank. Broadbent, who was president of Plainfield Village, executed a Payment Guaranty[2] ("Guaranty" or together, "Guaranties") for each of the Loans. The

---

[2] The Guaranties were a guarantee of payment, and upon default by borrower Plainfield Village, the Bank was permitted to proceed directly against Broadbent.

original maturity date of the Loans was June 30, 2009, but in June 2009, the maturity date of the Loans was extended to June 30, 2014 ("Extended Maturity Date"). Broadbent reaffirmed his Guaranties in writing in 2011 and 2013.

[4] Section 1 of the Guaranties provides that Broadbent guarantees the prompt payment and performance when due, whether by acceleration or otherwise, of "Liabilities," which term refers to the principal amounts of the two Loans, accrued interest on the Loans, and obligations under the related documents ("Loan Documents"), including the Loan Agreements, Mortgages and Security Agreements, Notes, and Assignment of Rents and Leases. Section 2 of the Guaranties identifies what happens in the event of default on the Liabilities. It states, in part:

> 2. **LIABILITIES GUARANTEED**. Subject to Section 7 below, in the event the Borrower fails at any time to pay any part or all of the Liabilities guaranteed when due, whether by acceleration or otherwise, the Guarantor, upon written demand of Lender, will pay or perform the Liabilities guaranteed in the same manner as if they constituted a direct and primary obligation of the Guarantor, and such obligation of the Guarantor shall be due with costs of collection, reasonable attorneys' fees and without relief from valuation or appraisement laws.

*Appellant's App*. at 209, 217. Section 7 of the Guaranties, which is referenced in Section 2, conditionally limits Broadbent's liability and provides:

> 7. **LIMITATION**. Notwithstanding anything to the contrary herein contained, upon the extension of the Loan[s] to the [Construction Loan and Additional Loan] Extended Maturity Date[s] in accordance with the terms of the Loan Agreement, the

obligations of Guarantor herein shall be limited to fifty percent (50%) of the outstanding balance of principal and accrued interest under the Note; provided, however, Guarantor agrees that any reduction of the Liabilities whether prior to or after the occurrence of an Event of Default[3] (as defined in the Loan Agreement) shall be applied first to that portion of the Liabilities not guaranteed by Guarantor hereunder.

*Id.* at 213, 221.

[5]   Plainfield Village failed to repay the entire outstanding balance of principal and interest by July 10, 2014 (ten days after the Extended Maturity Dates), and on August 15, 2014, the Bank sent written notice of default ("the Default Letter") to Plainfield Village and Broadbent. *Id.* at 229. In the Default Letter, the Bank demanded payment in full of all of Plainfield Village's Liabilities. On August 27, 2014, the Bank brought a lawsuit against both Plainfield Village and Broadbent. The Bank asserted four claims: one for breach of the loan documents, two for foreclosure on a mortgage and certain security interests, and one for breach of the Guaranties. *Id.* at 32-37.

[6]   In November 2014, the Bank moved for summary judgment on all claims against Plainfield Village and Broadbent. In support of its motion, the Bank designated the affidavit of Matthew Kirchner ("Kirchner Affidavit"), a vice

---

[3] The term "Event of Default" is defined in Section 9 of the Loan Agreement and includes any failure of Plainfield Village to pay any installment of principal or interest pursuant to the Loan Agreement or the Loans within ten days after it becomes due. *Appellant's App.* at 72.

president of the Bank who had "primary responsibility for the collection of amounts owed by Plainfield Village and Broadbent." *Appellee's Supp. App*. at 1. Attached to the Kirchner Affidavit were various documents, including the Loan Agreements, Construction Note, Additional Note, Mortgage, Assignment of Rents, Contract Assignment, Financing Statements, Broadbent's Guaranties, and the Default Letter. The Kirchner Affidavit stated that, as of August 21, 2014, Plainfield Village owed the Bank the following amounts:

|  | Construction Note | Additional Note |
|---|---|---|
| Unpaid Principal Balance: | $6,185,691.93 | $1,164,500.30 |
| Accrued and Unpaid Interest: | $25,431.43 | $4,492.33 |
| Subtotal: | $6,211,123.36 | $1,168,992.63 |

*Id*. at 6. Thus, the total amount due under the Loan Documents was $7,380,115.99, plus daily-accruing interest on both the Construction Loan and Additional Loan. In March 2015, Broadbent filed a brief in opposition to the Bank's motion for summary judgment, along with an affidavit of Broadbent ("Broadbent Affidavit").[4] *Appellant's App*. at 5-6, 231. In May 2015, the trial court held a hearing and took the matter under advisement.

---

[4] Although the Broadbent Affidavit is included in the record before us, Broadbent's motion in opposition to the Bank's motion for summary judgment is not.

[7] In or around June 2015, a buyer was found for the subject real estate, and all parties agreed that the property would be sold for not less than $3.55 million and further agreed that the trial court should approve the sale. Therefore, on June 30, 2015, the court-appointed receiver over the Plainfield Village property filed an agreed motion ("Sale Motion") to sell the shopping center. The Sale Motion set forth an agreement ("Consent Agreement") between Broadbent and the Bank that provided:

> (e) . . . notwithstanding the actual dollar recoveries [the Bank] receives from the proceeds of the Sale of the Property, [the Bank] will credit the outstanding indebtedness owed to [the Bank] from Plainfield Village, LP and more specifically described in the Complaint as if [the Bank] received the sum of $4,400,000.00 (the "Credit").

*Id.* at 237. The Consent Agreement further provided that the Bank and Broadbent "each reserve all rights as to the impact that the Credit [of $4.4 million] will have on the calculation of the liability of Broadbent to [the Bank] under his Guarant[ies.]" *Id.* On July 1, 2015, the trial court approved the Sale Motion, and the sale closed on September 28, 2015. After closing costs and the broker's commission were deducted, the net proceeds from the sale were approximately $3.35 million.

[8] After the approval of the Sale Motion, the trial court granted the Bank's request for enlargement of time to (1) file a motion to dismiss its foreclosure claims, (2) submit a supplemental affidavit of indebtedness, and (3) file a revised proposed summary judgment order. Broadbent and Plainfield Village were given an

opportunity to respond, within thirty days, to the Bank's revised summary judgment order. Thereafter, the trial court dismissed the Bank's foreclosure claims pursuant to the parties' joint motion.

[9] On October 9, 2015, the Bank submitted a revised proposed summary judgment order, and it also filed, in support of summary judgment, a Supplemental Affidavit of Jonathan Nadybal ("Nadybal Affidavit"), a vice president of the Bank, who had primary responsibility at the Bank for collection of amounts owed by Plainfield Village and Broadbent. The Nadybal Affidavit reflected that, as of September 27, 2015, the day before the September 28 sale, the amounts owed under the Loan Documents were:

|  | Construction Note | Additional Note |
| --- | --- | --- |
| Unpaid Principal Balance | $6,181,920.65 | $1,164,500.30 |
| Accrued and Unpaid Interest | $158,247.93 | $29,500.15 |
| Subtotal | $6,340,168.58 | $1,194.000.45 |

*Id.* at 283. Thus, the total amount due under the Loan Documents was $7,534,169.03, plus daily-accruing interest on both the Construction Loan and Additional Loan.

[10]  On October 13, the trial court entered summary judgment in favor of the Bank and against Plainfield Village.[5] *Id.* at 9-10. However, in November 2015, the parties filed an agreed motion for a status conference, and because the trial court's summary judgment ruling was issued before the thirty days had run for Broadbent and Plainfield Village to respond to the Bank's revised summary judgment order, the trial court set aside its October 13, 2015 summary judgment order in December 2015 and gave Broadbent and Plainfield Village thirty days to respond to the Bank's proposed summary judgment order. In January 2016, Broadbent and Plainfield Village submitted a proposed order that denied the Bank's request for summary judgment.

[11]  On January 22, 2016, the trial court issued Findings of Fact, Conclusions of Law and Order Granting Summary Judgment, finding for the Bank and against Broadbent and Plainfield Village. The trial court found that the indebtedness owed to the Bank by Plainfield Village as of September 27, 2015, the day before the sale, was $7,534,169.03, in addition to accruing per diem interest on the Notes. *Id.* at 20 (citing Nadybal Affidavit). It also found that, pursuant to Guaranties,

> Broadbent is liable for fifty percent of the principal and accrued interest owed by Borrower under the Notes prior to any reduction by virtue of the Credit, with such reduction applied

---

[5] A copy of the October 13, 2015 summary judgment order is not included in the record before us, but the chronological case summary indicates that judgment was entered against Plainfield Village only. *Appellant's App.* at 10.

first to that portion of the principal and accrued interest <u>not</u> guaranteed by Broadbent.

*Id*. (emphasis in original).

[12] The trial court concluded that the Notes and other Loan Documents, including the Guaranties, "are unambiguous contracts," and it calculated Broadbent's obligation to the Bank as follows:

> 12. Prior to the application of the Credit, pursuant to the terms of Guaranty, Broadbent owed [the Bank] fifty-percent (50%) of the $7,534,169.03 of principal and accrued interest as of September 27, 2015, which was the amount of $3,767,084.52. Pursuant to the terms of the Guaranty, the Credit *is applied first to the fifty-percent* (50%) of the $7,534,169.03 principal and accrued interest *not guaranteed by Broadbent*, which eliminates that other fifty-percent (50%) and leaves $632,915.49 of Credit remaining to reduce the [G]uaranty obligation of Broadbent. The Broadbent Guaranty obligation of $3,767,084.52 is therefore reduced by the remaining credit of $632,915.49 to leave a net amount owed by Broadbent to [the Bank] of $3,134,169.03 plus interest accruing after September 27, 2015.

*Id*. at 23-24 (emphasis added). The trial court entered judgment in favor of the Bank in the amount of $3,134,169.03, along with interest accruing from September 27, 2015 to the date of the entry of the trial court's judgment, for a

total of $3,179,700.75, plus post-judgment interest accruing at the statutory rate of 8% per annum. *Id*. at 25. Broadbent now appeals.[6]

## Discussion and Decision

[13] We review the grant or denial of summary judgment de novo. *SPCP Grp., L.L.C. v. Dolson, Inc.,* 934 N.E.2d 771, 775 (Ind. Ct. App. 2010). In so doing, we stand in the same position as the trial court and must determine whether the designated evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). In making this determination, we construe the evidence in a light most favorable to the non-moving party and resolve all doubts as to the existence of a genuine factual issue against the moving party. *SPCP Grp., L.L.C.*, 934 N.E.2d at 775.

[14] A party seeking summary judgment bears the burden to make a prima facie showing that there are no genuine issues of material fact and that the party is entitled to judgment as a matter of law. *Riviera Plaza Invs., LLC v. Wells Fargo Bank, N.A.*, 10 N.E.3d 541, 545 (Ind. Ct. App. 2014). Once the moving party satisfies this burden through evidence designated to the trial court, the non-moving party may not rest on its pleadings, but must designate specific facts demonstrating the existence of a genuine issue for trial. *Id.* A trial court's grant

---

[6] Neither Broadbent nor Plainfield Village sought a stay, and according to the Bank, "[p]roceedings supplemental are ongoing." *Appellee's Br*. at 4.

of summary judgment is "clothed with a presumption of validity," and the appellant bears the burden of demonstrating that the trial court erred. *Id.*

[15] Interpretation of the language in a contract is a question of law especially suited for summary judgment proceedings. *Hepburn v. Tri-County Bank*, 842 N.E.2d 378, 384 (Ind. Ct. App. 2006), *trans. denied*. We review questions of law de novo*,* and therefore we give no deference to the trial court's interpretation. *Id.* Our goal is to give effect to the intent of the parties as expressed within the four corners of the document. *Id.* We may not construe unambiguous language to give it anything other than its clear, obvious meaning, and we may not add provisions to a contract that were not placed there by the parties. *Id.* Rather, we determine the meaning of a contract from an examination of all of its provisions, without giving special emphasis to any word, phrase or paragraph. *Id.* We must read a contract as a whole and may not interpret individual sections in a manner that would cause them to conflict. *Id.*

[16] In this case, the Bank and Broadbent do not disagree about the material facts. They agreed that Broadbent executed the Guaranties, the Guaranties are valid and enforceable, and Broadbent did not perform his contractual obligations under them and is in default. The inquiry is not whether Broadbent owes the Bank money, but, rather, how much he owes pursuant to the terms of the Guaranties.

[17] A guaranty is a conditional promise to answer for a debt or default of another person, such that the guarantor promises to pay only if the debtor/borrower

fails to pay. *TW Gen. Contracting Servs., Inc. v. First Farmers Bank & Trust*, 904 N.E.2d 1285, 1288 (Ind. Ct. App. 2009). The interpretation of a guaranty is governed by the same rules applicable to other contracts. *Id.* We must give effect to the intentions of the parties, which are to be ascertained from the language of the contract in light of the surrounding circumstances. *Id.*; *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1138 (Ind. Ct. App. 2002).

> Generally, the nature and extent of a guarantor's liability depends upon the terms of the contract, and a guarantor cannot be made liable beyond the terms of the guaranty. Nevertheless, the terms of a guaranty should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the guarantor of a liability fairly within their terms.

*TW Gen. Contracting Servs., Inc.*, 904 N.E.2d at 1288 (quoting *Bruno v. Wells Fargo Bank, N.A.*, 850 N.E.2d 940, 945-46 (Ind. Ct. App. 2006)). If the court finds that any term is ambiguous, then the parties may introduce extrinsic evidence of its meaning, and the interpretation of that term becomes a question of fact. *Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1261 (Ind. Ct. App. 1993), *trans. denied*. A word or a phrase is ambiguous if reasonable people could differ as to its meaning. *Id.* However, a contract term is not ambiguous merely because the parties disagree about the term's meaning. *Simon Prop. Grp., L.P. v. Mich. Sporting Goods Distribs., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005), *trans. denied*.

# I. Ambiguity Issue

[18] In its findings of fact and conclusions thereon, the trial court determined that the Guaranties are unambiguous contracts. *Appellant's App*. at 23 (Conclusion No. 9). Broadbent claims that this was error and that the Guaranties are ambiguous. More specifically, he asserts that Section 7 is ambiguous. It reads:

> 7. **LIMITATION**. Notwithstanding anything to the contrary herein contained, upon the extension of the Loan[s] to the [Construction Loan and Additional Loan] Extended Maturity Date[s] in accordance with the terms of the Loan Agreement, the obligations of Guarantor herein shall be limited to fifty percent (50%) *of the outstanding balance* of principal and accrued interest under the Note; provided, however, Guarantor agrees that any reduction of the Liabilities whether prior to or after the occurrence of an Event of Default (as defined in the Loan Agreement) shall be applied first to that portion of the Liabilities not guaranteed by Guarantor hereunder.

*Appellant's App*. at 213, 221 (emphasis added). Broadbent asserts that Section 7 is ambiguous because although the Guaranties limit his liability to fifty percent of the outstanding balance, "they do not state *when* that 'outstanding balance' is to be determined." *Appellant's Br*. at 9. He suggests that there are a number of possibilities for when that balance is to be determined, including: (1) the initial 2009 maturity date for the Loans; (2) the June 2014 Extended Maturity Date; (3) ten days after that, when Plainfield Village failed to pay and Default occurred; (4) when suit was filed; or (5) after the real property was sold. Broadbent maintains that, therefore, a question of fact exists, and summary judgment was improper.

In support, Broadbent refers us to his Affidavit, which he attached to his opposition to the Bank's motion for summary judgment. In it, he stated:

> 6. It was my understanding when I signed the Guaranties, and it is my understanding now, that once the maturity date of the Loans was extended to the Extended Maturity Date, my liability under the Guaranties would be limited to an amount equal to fifty percent (50%) of the outstanding balance of principal and accrued but unpaid interest due under the Notes, *determined after the Mortgaged Property had been sold* in order to know what the actual unpaid balances are, if any.

*Appellant's App*. at 232 (emphasis added). On appeal, Broadbent argues that his intent when signing the Guaranties was that his liability as a guarantor would be limited to fifty percent of the outstanding balance of principal and interest "determined after all payments on the debt . . . had been applied[.]" *Appellant's Br*. at 10.

The Bank maintains that the trial court correctly determined that the Guaranties are unambiguous, and that, therefore, extrinsic evidence of Broadbent's understanding of the Guaranties – here, his Affidavit – is not to be considered. *Appellee's Br*. at 12 (citing *Skrypek v. St. Joseph Valley Bank*, 469 N.E.2d 774, 777 (Ind. Ct. App. 1984) (extrinsic evidence is inadmissible where there is no ambiguity in contract language)). We agree.

Here, as the Bank states, "The [G]uaranties do provide when the outstanding balance is to be determined: upon [the Bank]'s written demand." *Id*. at 9. Section 2, identifying Broadbent's Liabilities, provides:

2. **<u>LIABILITIES GUARANTEED</u>**. Subject to Section 7 below, in the event the Borrower fails at any time to pay any part or all of the Liabilities guaranteed when due, whether by acceleration or otherwise, *the Guarantor, upon written demand of Lender, will pay* or perform *the Liabilities* guaranteed in the same manner as if they constituted a direct and primary obligation of the Guarantor, *and such obligation of the Guarantor shall be due* with costs of collection, reasonable attorneys' fees and without relief from valuation or appraisement laws.

*Appellant's App.* at 209, 217 (emphasis added). Under that Section, when Broadbent failed to pay his Liabilities, ten days after the Extended Maturity Date, Section 2 obligated Broadbent to pay Liabilities upon the Bank's written demand, which initially was in August 2014, and "such obligation shall be due," along with accruing interest, costs of collection, and reasonable attorneys' fees. *Id*.

[22] It is well-settled that courts must read contracts, including guaranties, as a whole and give effect to all provisions. *Hepburn*, 842 N.E.2d at 384. Therefore, we reject Broadbent's position that effectively asks us to read Section 7 in isolation. Section 2 is "[s]ubject to" Section 7, and, indeed, the two Sections are interrelated. *Appellant's App.* at 209, 217. Section 2 identifies Broadbent's obligation to pay the Bank upon the Bank's demand, and Section 7 limits the amount that Broadbent must pay, namely it reduces his obligation on the unpaid debts from one-hundred percent to an amount not to exceed fifty percent of the outstanding balance of principal and accruing interest. We find

no error in the trial court's determination that the Guaranties were unambiguous contracts.

## II. Calculation of Broadbent's Obligations

[23] Broadbent claims that the trial court's calculation of the amount he owed on the Loans was erroneous, as it "ignored the language of Section 7[,]" and, therefore, the judgment should be reversed. *Appellant's Br*. at 13. At its core, Broadbent's dispute is how and when the $4.4 million Credit was applied to outstanding Liabilities.

[24] In calculating what Broadbent owed, the trial court determined that Section 7 unambiguously limited Broadbent's liability, as Guarantor, to fifty percent of the outstanding balance of principal and accrued interest, and, further, it required that any credit (here, the agreed $4.4 million for the sale of the property) be applied, first, to the non-guaranteed fifty percent portion of the Loans, and to the extent that that credit exceeded the non-guaranteed portion, then to Broadbent's guaranteed fifty percent portion. Applying those determinations to the figures, the trial court initially divided $7,534,169.03 (amount owed as of September 27, 2015) in half because, pursuant to Section 7, Broadbent was responsible for only fifty percent, or $3,767,084.52. Next, pursuant to the language of Section 7, the trial court applied the agreed-upon $4.4 million Credit to the non-guaranteed half. Because the Credit exceeded the non-guaranteed portion by $632,915.49, that excess Credit then was applied to reduce Broadbent's fifty-percent portion ($3,767,804.52), such that he was

left owing the Bank $3,134,169.03, in addition to per diem interest, as well as post-judgment interest.

[25] Broadbent suggests that on January 22, 2015, when the trial court entered summary judgment for the Bank and against Broadbent, the outstanding balance of principal and interest was $3,179,700.75[7] and that his fifty percent of that was $1,589,850.38. He maintains that Section 7 "contemplates the application of payments . . . from the sale of the property to establish the outstanding balance of principal and interest" and, thereafter, that figure should be divided in half to arrive at his fifty percent. *Id*. at 15. That is, Broadbent asserts that the $4.4 million Credit should be applied *before* the $7,534,169.03 is divided in half, rather than applying it *after* the $7,534,169.03 is divided 50/50 between guaranteed and non-guaranteed portions. We cannot agree.

[26] Broadbent's proposal that the $4.4 million Credit be applied to the total amount owed on the Loans is contrary to the language of Section 7, which expressly limits Broadbent's liability to fifty percent "provided, however," that "any reduction of the Liabilities . . . shall be applied *first* to that portion of the Liabilities *not guaranteed* by Guarantor hereunder." *Appellant's App*. at 213, 221 (emphasis added). Indeed, Broadbent's reading would apply the Credit to both the non-guaranteed and guaranteed portions, and it would leave the Bank with $1,589,850.38 in non-guaranteed loans, which is not consistent with Section 7's

---

[7] $7,534,169.03 - $4,400,000 credit = $3,134,169.03 + per diem interest on Loans = $3,179,700.75.

provision that all reductions in Liabilities – here, the $4.4 million – would first be applied to the portion not guaranteed by Broadbent.

[27] Finding that the trial court properly interpreted the Guaranties and applied the Guaranties' terms to calculate Broadbent's liability and that no genuine issue of material fact exists, we affirm the trial court's grant of summary judgment in favor of the Bank.

[28] Affirmed.

[29] Riley, J., and Pyle, J., concur.