## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 17 2017, 7:52 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

George W. Hopper
Michael W. McBride
Cohen & Malad, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Paul D. Vink
Bose McKinney & Evans LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Sanders Development Group, Inc., <br><br> *Appellant-Plaintiff,* <br><br> v. <br><br> Willow Properties, LLC, <br><br> *Appellee-Defendant* | March 17, 2017 <br><br> Court of Appeals Case No. 06A04-1604-PL-941 <br><br> Appeal from the Boone Circuit Court <br><br> The Honorable J. Jeffrey Edens, Judge <br><br> Trial Court Cause No. 06C01-1503-PL-184 |

**Mathias, Judge.**

[1] Sanders Development Group, Inc. ("Sanders Development") appeals the Boone Circuit Court's entry of summary judgment in favor of Willow Properties, LLC ("Willow Properties"). Sanders Development appeals and raises the following

dispositive issue: whether genuine issues of material fact concerning the parties' intent in entering into the contract precludes the entry of summary judgment in favor of Willow Properties.

We reverse and remand for proceedings consistent with this opinion.

## Facts and Procedural History

Sanders Development is a property development company owned by Mark Sanders. The company has developed approximately thirty residential subdivisions since its formation in 1976. Sanders Development typically performs the work necessary to convert vacant real estate into developed lots ready for sale for home construction.

In 2001, Mark Sanders, his now ex-wife Linda Sanders, Jeffrey Belskus, and Debrorah Belskus formed Willow Properties, a member-managed limited liability company. The company's goal was to develop 168 acres of undeveloped real estate located in Zionsville, Indiana, into a subdivision later named Willow Ridge.

Willow Properties and Sanders Development later entered into a contract that states in its entirety:

> The undersigned, being the Shareholder(s) and Director(s) of Willow Properties, LLC, agree to pay Sanders Development Group, Inc., a 7% management fee of the sales price on each Willow Properties lot sale, to be paid at the time of closing. This agreement is effective January 1, 2002.

Appellant's App. p. 149. The agreement was signed by all four members of Willow Properties.

[6]     Thereafter, Sanders Development developed the real estate and received a 7% management fee of the sales price of each lot sold. In January 2009, five unsold lots remained.

[7]     In early 2009, Mark Sanders and Linda Sanders dissolved their marriage. As a result of the dissolution proceedings, Mark transferred his interest in Willow Properties to Linda. Mark transferred all records in his possession relating to Willow Properties to the remaining three members.

[8]     On August 31, 2010, Lot 52 was sold. Sanders Development did not receive its 7% management fee at closing. On June 7, 2011, Jeffrey Belskus met with Mark Sanders and informed him that Willow Properties was terminating the contract between the company and Sanders Development. On that date, four unsold lots remained in the subdivision. Between July 14, 2011, and April 10, 2015, the remaining four lots were sold, but Sanders Development was not paid its 7% management fee at the closings. The total sales price of the last five lots was $1,571,000.

[9]     On March 13, 2015, Sanders Development filed a complaint in Boone Circuit Court against Willow Properties alleging breach of contract and unjust enrichment. Sanders Development claimed that it was owed the 7% management fee for the sale of the last five lots in the Willow Ridge subdivision.

Willow Properties filed a motion for summary judgment on October 30, 2015. Sanders Development subsequently filed a response and cross-motion for summary judgment. On January 26, 2016, the trial court issued an order granting Willow Properties motion for summary judgment with respect to the four lots that sold after Willow Properties terminated the contract. However, the trial court ordered Willow Properties to pay the 7% management fee to Sanders Development for the lot that sold on August 31, 2010. Thereafter, Sanders Development filed a motion to correct error, which the trial court denied. Sanders Development now appeals.

## Standard of Review

When reviewing a grant of summary judgment, we must draw all reasonable inferences in favor of the non-moving party and affirm only "'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016) (quoting Ind. Trial Rule 56(C)). Careful scrutiny must be given to a grant of summary judgment to ensure that the losing party was not improperly denied its day in court. *Id*. "Indiana's distinctive summary judgment standard imposes a heavy factual burden on the movant to demonstrate the absence of any genuine issue of material fact on at least one element of the claim." *Id*. Our standard of review is not altered by cross-motions for summary judgment. *Huntington v. Riggs*, 862 N.E.2d 1263, 1266 (Ind. Ct. App. 2007), *trans. denied*.

Cases involving contract interpretation generally are particularly appropriate for summary judgment. *Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 840 (Ind. Ct. App. 2016), *trans. denied*. "When the terms of a contract are ambiguous or uncertain, however, and its interpretation requires extrinsic evidence, its construction is left to the factfinder." *Id*. "When summary judgment is granted based on the construction of a written contract, the trial court has either determined as a matter of law that the contract is not ambiguous or uncertain, or that any contract ambiguity can be resolved without the aid of a factual determination." *Id*. at 840-41.

## The Parties' Intent

"The goal of contract interpretation is to determine the intent of the parties when they made the agreement." *Tender Loving Care Mgmt., Inc. v. Sherls*, 14 N.E.3d 67, 72 (Ind. Ct. App. 2014). This court must examine the plain language of the contract, read it in context and, whenever possible, construe it so as to render every word, phrase, and term meaningful, unambiguous, and harmonious with the whole. *Id*. Construction of the terms of a written contract generally is a pure question of law. *Id*. If, however, a contract is ambiguous, the parties may introduce extrinsic evidence of its meaning, and the interpretation becomes a question of fact. *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016), *trans. denied*. "A word or phrase is ambiguous if reasonable people could differ as to its meaning." *Id*. A term is not ambiguous solely because the parties disagree about its meaning. *Id*.

[14] If contract language is unambiguous, this court may not look to extrinsic evidence to expand, vary, or explain the instrument but must determine the parties' intent from the four corners of the instrument. *Tender Loving Care Mgmt.*, 14 N.E.3d at 72. If the language is ambiguous, the contract terms must be construed to determine and give effect to the intent of the parties when they entered into the contract. *Id.* "Courts may properly consider all relevant evidence to resolve an ambiguity." *Id.* "'Extrinsic evidence is evidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement.'" *Id.* (quoting *CWE Concrete Const., Inc. v. First Nat'l Bank*, 814 N.E.2d 720, 724 (Ind. Ct. App. 2004), *trans. denied*). An ambiguous contract should be construed against the party who furnished and drafted the agreement. *Id.*

[15] Willow Properties and Sanders Development reduced the following agreement to writing:

> The undersigned, being the Shareholder(s) and Director(s) of Willow Properties, LLC, agree to pay Sanders Development Group, Inc., a 7% management fee of the sales price on each Willow Properties lot sale, to be paid at the time of closing. This agreement is effective January 1, 2002.

Appellant's App. p. 149. Willow Properties argues that the term "management" is unambiguous and under the plain terms of the contract, Sanders Development agreed to manage the subdivision. Sanders Development argues

that the term "management" is ambiguous, and therefore, the parties' intent must be established by extrinsic evidence.

[16] "Management" is defined as "the act or art of managing: the conducting or supervising of something (as a business)."[1] The Oxford English Dictionary defines management as: "organization, supervision, or direction; the application of skill or care in the manipulation, use, treatment, or control (of a thing or person), or in the conduct of something."[2]

[17] The plain meaning of the term "management" is generally easily understood. However, the term, when considered within the four corners of the contract at issue, is ambiguous.

[18] First, the plain language of the contract does not establish that Willow Properties hired Sanders Development to manage the subdivision. The contract language simply provides that Willow Properties agrees to pay Sanders Development a 7% management fee of the sales price of each lot that sells and the fee will be paid at closing. From this language, we can infer that Sanders Development is required to manage something to receive the fee that Willow Properties agreed to pay.

---

[1] Merriam-Webster Online, www.merriam-webster.com/dictionary/managment (last visited Feb. 28, 2017).

[2] Oxford English Dictionary Online, www.oed.com/view/Entry/113218?redircted/From=management#eid (last visited Feb. 28, 2017).

However, it is not clear what Sanders Development was tasked with managing under the contract. Was the company managing a subdivision? Was the company simply managing lots within a subdivision? Was the company managing Willow Properties' real estate that was not yet developed into lots? Also, what duties did Willow Properties intend for Sanders Development to perform in exchange for payment of the management fee? The answer to this last question depends at least in part on whether the lots pre-existed the contract or were to be developed after the contract was executed.

From extrinsic evidence, we know that Willow Properties owned real estate that had not yet been developed into lots. We also know that Sanders Development was hired to develop the property into lots that could be sold as home sites.

However, the parties disagree on the precise nature of Sanders Development's duties. Sanders Development claims it was hired only to prepare the real estate for development, but Willow Properties argues that Sanders Development was hired to manage the lots until all lots were sold. In support of these arguments, the parties rely primarily on deposition testimony and affidavits, and therefore, the credibility of the witnesses is crucial to resolving the fact questions posed in this case.

For these reasons, we conclude that the term "management" is ambiguous and the duties that Sanders Development was required to perform in exchange for its fee of 7% of the sales price of each lot is a fact question that must be resolved

by the fact-finder. Ultimately, it is within the fact-finder's purview to determine whether Sanders Development completed its management of Willow Properties' lots and whether Willow Properties breached the contract by refusing to pay the 7% management fee for each lot sold.

[23]   We reverse the entry of summary judgment in Willow Properties' favor and remand for proceedings consistent with this opinion.

Baker, J., and Pyle, J., concur.