


FILED

May 01 2024, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

James P. Devlin,

*Appellant-Defendant*

v.

Horizon Bank, successor in interest to Salin Bank & Trust Company by merger,

*Appellee-Plaintiff*

---

May 1, 2024

Court of Appeals Case No.
23A-MF-1986

Appeal from the Hendricks Superior Court

The Honorable Rhett M. Stuard, Judge

Trial Court Cause No.
32D02-1802-MF-41

---

**Opinion by Judge Mathias**
Judges May and Vaidik concur.

**Mathias, Judge.**

[1] James P. Devlin appeals the trial court's amended judgment in favor of Horizon Bank, the successor in interest to Salin Bank & Trust Company ("the Bank"). This cause arose out of Devlin's surety agreement with the Bank, which agreement enabled Devlin's son, Brendan, to obtain a farm operating loan. Devlin raises seven issues for our review, which we consolidate and restate as the following two issues:

> 1. Whether the trial court clearly erred when it found and concluded that the Bank did not impair Brendan's collateral for the loan when the Bank did not take steps to insist on receiving jointly payable proceeds prior to Brendan's default.

> 2. Whether the trial court erred when it interpreted Devlin's surety agreement to not require the Bank to keep Devlin informed of subsequent modifications to its agreement with Brendan and to not keep Devlin informed of Brendan's purported misconduct.

[2] We affirm.

## Facts and Procedural History

[3] Brendan Devlin is a farmer and Devlin's son. On July 9, 2015, Brendan executed a set of documents with the Bank that enabled him to receive a farm

operating loan.[1] The loan consisted of an $800,000 line of credit with a variable interest rate and a July 9, 2016, maturity date. The loan was secured in part by Brendan's crops, his receipt of certain insurance and government-program payments, and his farming inventory.

[4]     Brendan's agreement with the Bank contained the following provisions with respect to Brendan's sale of his crops:

> (1) To induce [the Bank] to extend the credit . . . secured by this Agreement, [Brendan] represents and warrants to [the Bank] that [Brendan] will sell . . . the Collateral only to those persons whose names and addresses have been set forth on sales schedules delivered to [the Bank]. Each schedule shall be in such form as [the Bank] may require . . . .
>
> (2) [Brendan] agrees to provide the [Bank] a written list or schedule of the buyers . . . including the entity name, contact name and address to whom or through whom the crops may be sold . . . . All such schedules and notifications shall be in writing and shall be delivered to [the Bank] not less than fourteen (14) days prior to any such sale . . . of the crops. Also, [Brendan] agrees to provide any updates or amendments to these schedules or lists to the [Bank].

---

[1] Brendan's then-wife, Carrie Doub, also executed all the necessary documents for Brendan to obtain this loan and its ensuing modifications, but for ease of reference we need only discuss Brendan. The Bank eventually obtained default judgments against both Brendan and Carrie, and they are not participants in this appeal.

(3) All proceeds of any sale . . . shall be made immediately available to [the Bank] in a form jointly payable to [Brendan] and [the Bank]. . . .

(4) [Brendan] acknowledges that if the crops are sold . . . to any person not listed on a schedule delivered to [the Bank] as provided above, at least seven (7) days prior to such sale . . . , then under federal law, [Brendan] shall be subject to a fine which is the greater of $5,000 or 15% of the value of the benefit received from the sale . . . .

Ex. Vol. 5, p. 125.

[5] Following the parties' execution of the loan documents, the Bank filed its U.C.C. Financing Statement with the Secretary of State, which secured the Bank's interest in Brendan's collateral. *See* Ind. Code §§ 26-1-9.1-308, -310 (2023). In particular, the U.C.C. Financing Statement identified the Bank as a secured party to Brendan's crops and identified in an attached schedule the locations of his crops. The U.C.C. Financing Statement also provided space for the Bank to identify potential buyers of those crops as reported to the Bank by Brendan. However, the Bank did not insist on receiving this information from Brendan, and, thus, the Bank left that space in the financing statement empty.

[6] Devlin is a certified public accountant and spent much of his career, prior to his retirement, as the head of the audit department of an Indiana bank. His work required him to audit "books and records, policies, [and] loans," and he had a necessary understanding of "how banks work" and "[l]oan documents in particular." Tr. Vol. 4, p. 153. At the time Brendan sought the loan from the

Bank, Devlin had done his own calculations on Brendan's likely crop proceeds. Those calculations made Devlin "feel good" about Brendan's financial position. *Id.* at 158.

Devlin agreed to act as a surety for Brendan's loan with the Bank. Specifically, in exchange for the Bank agreeing to extend the loan to Brendan, Devlin agreed to provide the Bank with the additional security of a mortgage against approximately eighty-five acres of land owned by Devlin near Lizton ("the Mortgage").[2] The terms of the Mortgage capped Devlin's exposure at $1.6 million and made clear that it secured "a revolving line of credit[] under which [the Bank] may make future obligations and advances to [Brendan] . . . ." Appellee's App. Vol. 2, p. 113. The Mortgage further made clear that it "also secures all modifications, extensions and renewals of [Brendan's] Note . . . ." *Id.* Indeed, the Mortgage defined "Note" as "the promissory note dated July 9, 2015, in the original principal amount of $800,000.00 from [Brendan] to [the Bank], *together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note . . . .*" *Id.* at 121 (emphasis added). And, in executing the Mortgage, Devlin agreed that he had "established adequate means of obtaining from [Brendan] on a continuing basis information about [Brendan's] financial condition . . . ." *Id.* at 114.

---

[2] Devlin's wife also executed the documents relevant to the Mortgage, but she has since died, and for ease of reference we need only discuss Devlin.

In September 2015, Brendan and the Bank agreed to modify the terms of the loan such that the frequency of Brendan's repayments changed from monthly to semi-annually ("the September 2015 modification"). Brendan proceeded to use all but a few hundred dollars of the line of credit, which included misusing the line of credit to buy $200,000 of real property and farm equipment.[3] Accordingly, on July 9, 2016, the original maturity date, Brendan and the Bank agreed to a second modification of the loan, which pushed the maturity date back to October 9, 2016 ("the July 2016 modification"). Then, on that date, Brendan and the Bank agreed to another modification of the loan; under this modification, Brendan executed a new set of documents that reduced the amount available on the original line of credit to $600,000 with a new maturity date of October 9, 2017 ("the October 2016 modification"). And, in December 2016, Brendan executed a third set of documents that converted the misused $200,000 into a term loan obligation ("the December 2016 loan"), which was a "[n]ormal and customary" banking practice in such circumstances. Tr. Vol. 4, p. 9. The Bank did not inform Devlin of any of those changes to the original loan's terms.

Between the initial issuance of the loan and the October 2016 modification, Brendan made approximately $246,000 in payments to the Bank. But Brendan did not insist on payments for his crops being made jointly payable to both him

---

[3] An employee of the Bank who worked on agricultural loans later testified that misusing a farm operating line of credit to buy real property and farm equipment is "commonly" done. Tr. Vol. 4, p. 8.

and the Bank, and he received approximately $363,000 in additional proceeds from his sale of crops during that same time, which proceeds he deposited into his personal checking account with another bank. Brendan also received a government-program payment in excess of $43,000 that he deposited into that account. And, in the last months of 2016, after he had agreed to the October 2016 modification, Brendan received approximately $348,000 from crop sales and $116,500 in government-program payments, which he again deposited into his personal checking account.

[10] Meanwhile, between 2015 and 2017, Devlin also acted as a creditor to Brendan, extending to Brendan a separate revolving line of credit to help fund Brendan's farming operations. At one point, Brendan owed approximately $150,000 to Devlin on this line of credit. Between December 2016 and April 2017, Brendan paid $77,750 to Devlin; Brendan paid those sums to Devlin using checks associated with a small business account he had with the Bank. During that same time period, Brendan withdrew more than $290,000 on his line of credit with the Bank. In 2020—after the Bank had filed suit—Brendan continued making payments to Devlin, and Brendan had paid his debt to Devlin down to about $14,000.

[11] Brendan failed to repay his line of credit with the Bank by its maturity date in October 2017. Brendan's default on the line of credit also operated as a default on the December 2016 loan. The Bank then, for the first time, sent written notices of its crop lien to potential buyers of Brendan's crops for the upcoming 2017 harvest season; this resulted in the issuance of some checks jointly payable

to Brendan and the Bank, but the proceeds the Bank received from those payments were substantially less than the Bank had anticipated, and they were insufficient to satisfy Brendan's debt. Meanwhile, Brendan sold crops from his 2017 harvest to buyers who had not been notified by the Bank of its crop lien, and he did not use the proceeds of those sales to pay down or to satisfy his debt with the Bank.

[12] In February 2018, the Bank filed its complaint, which it later twice amended. As relevant here, the Bank's last-amended complaint sought to foreclose on the Mortgage and to obtain an in rem judgment against Devlin's property. Devlin moved for summary judgment on the ground that Brendan and the Bank's various modifications of the original loan without notice to him and consent from him discharged him of his obligations as a surety. The trial court denied that motion.

[13] After a three-day bench trial in May 2023, the court entered judgment for the Bank. In doing so, the court expressly found and concluded that, while the Bank "could have been more diligent in its efforts to safeguard the proceeds from the sale of crops, none of the Bank's actions were 'improper.'" Appellant's App. Vol. 2, p. 83. The court added that Brendan, not the Bank, was "responsible for the loss of collateral" as he had "utterly failed" to satisfy his obligations to the Bank. *Id.* at 83-84. And the court further made it a point to note that "Devlin himself is also to blame," stating:

69. Devlin[] is an educated and intelligent man, a CPA who audited banks during his professional life. He was best positioned to watch his son, to monitor the comings and goings of crops.

70. Devlin certainly kept track of the money he personally lent Brendan, keeping notes regarding how much he loaned and how much was repaid.

71. Devlin even accepted repayment from Brendan on a personal loan AFTER this case was filed and he had actual knowledge that Brendan was not repaying the Bank.

72. With respect to the amount Brendan owed the Bank, for which Devlin had pledged his land as security, Devlin now claims that he effectively had no means to monitor what his son was doing and that he was solely at the mercy of the Bank to keep him advised of Brendan's activity and to ensure that Brendan was acting honestly.

73. Paraphrasing the Indiana Court of Appeals . . . , the Bank was not required to police Brendan's integrity on behalf of Devlin.

*Id.* at 84-85 (citation omitted). The trial court then foreclosed on the Mortgage and entered an in rem judgment against Devlin's property. The court later amended that judgment to include an award to the Bank for its attorneys' fees and costs, bringing the total amount of the in rem judgment to $1,137,566.74.

[14] This appeal ensued.

## 1. The trial court's findings and conclusions that the Bank did not impair Brendan's collateral are supported by the record.

On appeal, Devlin first argues that the trial court erred in various ways with respect to not holding the Bank responsible for "fail[ing] to enforce its security interest in Brendan's crop proceeds." Appellant's Br. at 31-32. The trial court's judgment on these issues is supported by findings of fact and conclusions thereon following a bench trial. For such issues, we review the court's judgment under our clearly erroneous standard. *Jones v. Gruca*, 150 N.E.3d 632, 640 (Ind. Ct. App. 2020), *trans. denied*. "We 'neither reweigh evidence nor judge witness credibility.'" *Id.* (quoting *R.L. v. Ind. Dep't of Child Servs. & Child Advocates, Inc.*, 144 N.E.3d 686, 689 (Ind. 2020)). Rather, a judgment is clearly erroneous only when there are no record facts that support the judgment or if the court applied an incorrect legal standard to the facts. *Id.*

Devlin argues that the Bank failed to do its utmost to secure its right to jointly payable proceeds from Brendan's sale of his crops. In particular, he contends that the Bank did not obtain from Brendan a list of potential buyers of his crops when he signed the first set of loan documents in July 2015 and that the Bank failed to send any potential buyers written notice of its security interest in the proceeds of Brendan's sale of his crops in 2015 and 2016, which enabled buyers to take those crops free of the Bank's security interest. *See* I.C. § 26-1-9.1-320. Had the Bank taken those steps, Devlin continues, the Bank could have ensured receipt of jointly payable proceeds and used those proceeds to reduce Brendan's debt and, in turn, reduce Devlin's exposure to liability. Likewise, Devlin asserts

that the Bank failed to secure jointly payable insurance and government-program proceeds received by Brendan.

[17] One who mortgages his or her land to secure the debt of another stands in the position of surety to the debtor. *Brooks v. Bank of Geneva*, 97 N.E.3d 647, 652 (Ind. Ct. App.), *aff'd on reh'g*, 105 N.E.3d 197 (2018), *trans. denied*. "It is axiomatic that a surety is a favorite of the law and must be dealt with in the utmost good faith." *Id.* Thus, under Indiana's common law, a surety may seek to avoid liability in a suit by a creditor by asserting an impairment-of-collateral defense.[4] *Farmers Loan & Trust Co. v. Letsinger*, 652 N.E.2d 63, 66 (Ind. 1995). Pursuant to this defense, a surety may avoid liability to the extent that a "creditor *unjustifiably* impair[ed] the collateral securing a guarantied loan." *Id. at 67* (emphasis added). As relevant here, impairment of collateral means an injury to the value of the collateral or a deterioration of the interest securing the collateral. *See Cole v. Loman & Gray, Inc.*, 713 N.E.2d 901, 904 (Ind. Ct. App. 1999).

[18] Our Supreme Court has explained that this defense "makes sense for two reasons." *Letsinger, 652 N.E.2d at 66*. First, a surety, at the time of entering into the contract, "may make the judgment that the collateral for the loan . . . will be sufficient to cover the debt." *Id.* Thus, if the creditor impairs that collateral, the surety "may become exposed to liability" beyond his expectation at the time of

---

[4] We agree with Devlin that he did not waive his right to assert this defense in his Mortgage.

the contract. *Id.* Second, a surety who does satisfy the debtor's obligation to the creditor "steps into the shoes of the creditor" and assumes the creditor's rights and duties. *Id.* at 67. Thus, if the creditor has unjustifiably impaired the collateral, the creditor will have impaired the surety's recourse as the surety understood his recourse to be at the time of the contract. *Id.*

[19] We first address Devlin's argument that the Bank failed to obtain the information for and to send written notices of its security interest to potential buyers of Brendan's crops in 2015 and 2016, which, according to Devlin, allowed Brendan to dissipate collateral. Devlin's argument here is premised on his assertion that the trial court erred as matter of law when it considered whether the Bank's decisions to not take those measures were justified or reasonable. According to Devlin, the trial court's assessment mistakenly relied on precedent from our Court that discussed Indiana's provisions of the Uniform Commercial Code on negotiable instruments, which is not the law applicable to Devlin's surety agreement,[5] rather than relying on precedent that applied Indiana's common law. Devlin then asserts that, under our common law, "if an impairment occurs, then the obligor is released to the extent of the impairment. Period." Appellant's Br. at 41.

[20] The trial court's judgment for the Bank does at times misapply case law relating to Indiana's provisions of the U.C.C. on negotiable instruments, which, in

---

[5] Devlin's Mortgage is not a negotiable instrument because, among other reasons, it is not a promise to pay a sum certain. *See Letsinger*, 652 N.E.2d at 65 (citing I.C. § 26-1-3.1-104(a) (1994)).

interpreting a prior version of our U.C.C., considered whether the creditor had acted "improper[ly]" or "unreasonabl[y]" vis-à-vis the collateral. *Williams v. Lafayette Prod. Credit Ass'n*, 508 N.E.2d 579, 583-84 (Ind. Ct. App. 1987); *Wisconics Eng'g, Inc. v. Fisher*, 466 N.E.2d 745, 767 (Ind. Ct. App 1984) (quotation marks omitted), *trans. denied*. Our case law also often conflates Indiana's common law and our U.C.C. provisions with respect to impairment of collateral. *See, e.g.*, *Cole*, 713 N.E.2d at 904.

[21] Nonetheless, as Justice Sullivan made clear for our Supreme Court in *Letsinger*, Indiana's common law on the impairment-of-collateral defense requires the creditor's actions to have "*unjustifiably* impair[ed]" the collateral. 652 N.E.2d at 67 (emphasis added). The *Letsinger* Court also cited as supporting authority Indiana's provisions of the U.C.C. on secured transactions, which require that "a secured party must use reasonable care" with respect to collateral. *Id.* at 67 (citing I.C. § 26-1-9-207(1) (1992)); *see also* I.C. § 26-1-9.1-207(a) (2023). Further, the Court recognized that our U.C.C.'s provisions on negotiable instruments "incorporated the general law of surety." *Letsinger*, 652 N.E.2d at 67. We therefore agree with the Bank that the trial court's reasoning for its judgment is clear and that any misapplication of law relating to Indiana's provisions of the U.C.C. on negotiable instruments was superfluous to the court's judgment.

[22] Accordingly, and Devlin's assertions notwithstanding, the impairment-of-collateral defense under our common law does require the surety to establish some "unjustifi[ed]" or unreasonable act by the creditor. *See id.* at 66-67. For

example, in *Letsinger*, the creditor failed to renew its security interest in the collateral, which renewal simply required the creditor to timely refile a financing statement. The debtor then filed for bankruptcy, and the unsecured collateral was liquidated to pay other creditors. Our Supreme Court held that the creditor's failure to refile its financing statement "exposed the [sureties] to personal liability to which they did not contract," and, thus, the sureties were discharged from their guarantee under the impairment-of-collateral defense. *Id.* at 66-67.

[23] Here, the record supports the trial court's finding that the Bank did not act unjustifiably or unreasonably either when the Bank did not insist that Brendan provide information for potential buyers at the outset of his relationship with the Bank or when the Bank did not send written notices to potential buyers of its crop lien prior to Brendan's default. During the trial, the Bank introduced evidence from several expert witnesses. The Bank's experts agreed that whether to insist on information for potential buyers and to send written notices to those potential buyers at the front-end of a farm operating loan would have been a function of the strength of the debtor's loan application. The experts likewise agreed that Brendan's loan application—including Devlin's Mortgage in support of that application—was a strong application, and, as such, it would not have been "standard" or "customary" for a lender in the Bank's position to initially insist on securing jointly payable proceeds from potential buyers. Tr. Vol. 2, pp. 205-06; Tr. Vol. 3, p. 157.

[24] The Bank's experts also agreed that, if a "borrower/farmer was determined to be dishonest and sell to other grain purchasers that were not notified," insisting on jointly payable proceeds from potential buyers would not be likely to prevent him from doing so. Tr. Vol. 2, pp. 205-06. Indeed, Brendan proved that point— following his default on the loan, the Bank sent written notices to potential buyers of its crop lien in order to secure jointly payable proceeds, to which Brendan responded by simply selling his crops to buyers who had not been notified by the Bank of its lien.

[25] Thus, we cannot say that Devlin has shown that the Bank's failure to insist on obtaining jointly payable proceeds from potential buyers at the outset of its relationship with Brendan was unjustified or unreasonable. Nor can we say that, had the Bank done differently, it would have in fact mattered here given the clear evidence of Brendan's determination to not repay the Bank. The trial court's findings and conclusions as to this issue are therefore not clearly erroneous.

[26] We briefly address Devlin's two additional arguments, namely, that the Bank failed to secure jointly payable insurance and government-program proceeds. Those arguments are readily resolved on this particular record. First, there is no evidence credited by the trial court that Devlin ever received insurance proceeds. *See* Appellant's App. Vol. 2, pp. 85-87. Thus, any failure by the Bank to secure jointly payable insurance proceeds cannot be a basis for reversible error here. *See Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023) (discussing Ind. Appellate Rule 66(A)).

[27] Second, while the trial court found and the record establishes that Brendan received approximately $159,000 in government-program payments that were not jointly payable, Devlin's argument in his brief cites no part of this voluminous record to show what the Bank could have or should have done to secure those payments in a jointly payable manner prior to Brendan's default. *See* Appellant's Br. at 46. Accordingly, and on this record, Devlin has not met his burden on appeal to show error here, either. *See* App. R. 46(A)(8)(a); *see also Letsinger*, 652 N.E.2d at 66-67.

[28] In sum, the trial court's findings and conclusions that the Bank did not act unjustifiably or unreasonably when it did not do more to secure jointly payable proceeds prior to Brendan's default is not clearly erroneous.

## 2. The trial court did not err in its interpretation of the Mortgage.

[29] We next consider Devlin's arguments that the Bank's various modifications of the original loan discharged him from his obligations as a surety. Devlin similarly argues that Brendan's misuse of the $200,000 and his sale of crops to buyers that had not been disclosed to the Bank constituted "misconduct" by Brendan, and the failure of the Bank to inform Devlin of that alleged misconduct also discharged him from his obligations as a surety. *See* Appellant's Br. at 47.

[30] The trial court resolved these arguments under the terms of Devlin's Mortgage. We review questions of contract interpretation de novo. *Decker v. Star Fin. Grp.,*

*Inc.*, 204 N.E.3d 918, 921 (Ind. 2023). The goal of contract interpretation is to ascertain and give effect to the parties' intent as reasonably manifested by the language of their agreement. *Id.* at 920 (quotation marks omitted). If the language is clear and unambiguous, it must be given its plain and ordinary meaning. *Id.* at 920-21 (quotation marks omitted).

[31] As we have explained:

> Generally, the nature and extent of a [surety's] liability depends upon the terms of the contract, and a [surety] cannot be made liable beyond the terms of the [contract]. Nevertheless, the terms of [the contract] should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the [surety] of a liability fairly within their terms.

*Shoaff v. First Merchs. Bank*, 201 N.E.3d 646, 653 (Ind. Ct. App. 2022) (quoting *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016)).

## 2.1. The plain terms of the Mortgage anticipated that the original loan's terms might be modified and captured those modifications accordingly.

[32] We initially consider Devlin's argument that the several modifications to the original loan's terms discharged him from his obligations as a surety. Under Indiana's common law, when parties cause a material alteration of an underlying obligation without the consent of the surety, the surety is discharged from further liability regardless of whether the alteration is to the surety's injury or benefit. *Id.* at 654 (quoting *Keesling v. T.E.K. Partners, LLC*, 861 N.E.2d 1246,

1251 (Ind. Ct. App. 2007)). A material alteration that effects a discharge of the surety is one that alters the legal identity of the principal's contract, substantially increases the risk of loss to the surety, or places the surety in a different position. *Id.* (quoting *Keesling*, 861 N.E.2d at 1251).

[33] We have historically viewed modifications such as those entered into between Brendan and the Bank as material alterations that would discharge a surety if entered into without the surety's consent. *See, e.g.*, *Brooks*, 97 N.E.3d at 653 (holding that a change to an obligor's payment terms without the surety's consent discharged the surety). But we have also recognized that a surety may "prospectively consent[] to alterations of [the underlying] obligation" in his surety agreement. *Kruse v. Nat'l Bank of Indianapolis*, 815 N.E.2d 137, 150 (Ind. Ct. App. 2004). As we have noted:

> We recognize that our jurisprudence in this area exhibits an internal tension. We have previously held, for example, that a change from monthly mortgage payments to semi-annual payments—without notice to the [surety]—was enough to discharge the [surety] from liability. In part, this tension is due to a fine distinction being drawn inconsistently. There is a difference between the question of whether an alteration is material, and whether it is contemplated and consented to by a contract.

*Shoaff*, 201 N.E.3d at 655 (citing *Brooks*, 97 N.E.3d at 653).

[34] In *Shoaff*, the surety's agreement with the lender stated as follows:

> I consent to all renewals, extensions, modifications and substitutions of the Debt which may be made by you [the lender]

upon such terms and conditions as you may see fit from time to time without further notice to me and without limitation as to the number of renewals, extensions, modifications or substitutions.

*Id.* at 650. The surety's agreement also contained a long list of additional waivers, which included the surety's consent to any renewals or extensions of the underlying debt agreement and "modify[ing] the terms of the Debt" or any instrument securing it. *Id.* at 651.

[35] After the debtor in *Shoaff* defaulted and the lender sought recourse against the surety, the surety argued that numerous subsequent modifications of the underlying debt agreement were material alterations entered into without his consent, which discharged him from his obligations. We disagreed, holding in relevant part that "the language of the [surety a]greement is exceptionally broad," and "[c]ontracts are not invalidated merely because they cast so wide a net." *Id.* at 656. We also noted that the surety was "a veteran attorney and—as with any litigant—is presumed to understand the documents which he signs and cannot be released from the terms of a contract due to his failure to read it." *Id.*

[36] So too here. The terms of Devlin's Mortgage made clear that it secured "a revolving line of credit[] under which [the Bank] may make future obligations and advances to [Brendan] . . . ." Appellee's App. Vol. 2, p. 113. The Mortgage further made clear that it "secure[d] *all modifications, extensions and renewals of [Brendan's] Note . . . .*" *Id.* (emphasis added). And the Mortgage defined the "Note" being secured by Devlin as "the promissory note dated July 9, 2015, in

the original principal amount of $800,000.00 from [Brendan] to [the Bank], *together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note . . . .*" *Id.* at 121 (emphasis added).

[37] The terms of the Mortgage are unambiguous and binding. By its plain terms, Devlin prospectively agreed that he was securing not just the initial loan from the Bank to Brendan but also any ensuing modifications of, refinancings of, consolidations of, and substitutions for the initial loan. While Devlin complains that the word "consent" does not appear in the above language, the obvious response is that that specific word did not need to appear given the plain language of what it was that he agreed to secure.[6] We also note that Devlin, like the surety in *Shoaff*, was a particularly sophisticated party, and we see no reason why he should not be held to his agreement.

[38] We therefore agree with the trial court that the plain terms of the Mortgage made it unnecessary for the Bank to seek additional consent from Devlin for the ensuing modifications entered into between Brendan and the Bank, and those modifications did not discharge Devlin from his obligations as a surety to the Bank.

---

[6] Devlin also substantially relies on our Court's opinion in *First Federal Bank v. Greenwalt*, but no part of our analysis in that opinion discusses the language of the surety's agreement with the lender. 42 N.E.3d 89, 93-97 (Ind. Ct. App. 2015).

**2.2. Devlin's Mortgage did not reserve a right for him to terminate his surety agreement based on any later-disapproved-of acts between Brendan and the Bank, and he therefore cannot now complain of how they managed their relationship.**

[39] Last, Devlin contends that Brendan's misuse of the $200,000 and his sale of crops to buyers that had not been disclosed to the Bank constituted "misconduct," and the failure of the Bank to inform Devlin of that alleged misconduct discharged Devlin from his obligations as a surety.[7] *See* Appellant's Br. at 47. In support of this argument, Devlin relies on our Court's opinion[8] in *Indiana Telco Federal Credit Union v. Young*, in which we stated that "a creditor's failure to notify a surety of a debtor's misconduct discharges the surety." 156 Ind. App. 483, 485, 297 N.E.2d 434, 435 (1973).

[40] But we have since made clear that that language "is not as global as [it] might lead one to believe." *Yin v. Soc'y Nat'l Bank Ind.*, 665 N.E.2d 58, 64 (Ind. Ct. App. 1996), *trans. denied*. As we explained in *Yin*:

> a creditor's mere failure to notify a surety of a debtor's misconduct does not automatically discharge the surety. Were it otherwise, a surety who had full knowledge of a debtor's misconduct could be discharged if the creditor failed to

---

[7] The trial court resolved this issue at least in part under the Mortgage's language that Devlin had "established adequate means of obtaining from [Brendan] on a continuing basis information about [Brendan's] financial condition . . . ." Appellee's App. Vol. 2, p. 114. We agree with Devlin that that language did not impose a duty on Devlin to track each of Brendan's ensuing financial transactions.

[8] In his brief, Devlin repeatedly misattributes this Court's opinion in *Indiana Telco* to our Supreme Court. *See* Appellant's Br. at 47-49.

independently notify the surety. This cannot be the intended result of the statement in *Indiana Telco*.

*Id.* at 65.

[41] In support of that assessment, we relied on the Restatement (First) of Security § 124(2) (1941). *Id.* at 64-65. The modern version of that same rule is now found in the Restatement (Third) of Suretyship and Guaranty § 47 (1996), which reads:

> If, *pursuant to the terms of the contract creating the secondary obligation, the secondary obligor has the power, upon the occurrence of a specified event, to terminate the secondary obligation* with respect to subsequent defaults of the principal obligor on the underlying obligation or subsequently incurred duties of the principal obligor, and:
>
> > (a) such event occurs;
> >
> > (b) the obligee knows such event has occurred; and
> >
> > (c) the obligee has reason to know that the occurrence of such event is unknown to the secondary obligor;
>
> the secondary obligor is discharged from the secondary obligation with respect to defaults of the principal obligor that occur, or duties of the principal obligor incurred, thereafter and before the secondary obligor obtains knowledge of the occurrence of the event.

(Emphasis added.)

[42]     The Restatement provides the following illustrations of section 47's operation:

> 1. B enters into a contract with O to construct four buildings, with construction of each successive building to be started only after completion of the previous one. S agrees with O to be a surety with respect to the completion of the buildings in accordance with the contract. *S's contract with O gives S the power, upon the failure of B to complete any building in substantial compliance with the contract specifications, to terminate its liability with respect to buildings not yet begun*. O discovers that the air conditioning system in the first building is not in compliance with the contract specifications and that the noncompliance is such that major portions of the building will need reconstruction in order for the building to comply with the contract. S is unaware of this noncompliance and O has reason to know of S's ignorance. If O does not disclose the noncompliance to S, S will be discharged from liability for defaults of B with respect to the subsequent buildings that are begun before S learns of the noncompliance.
>
> 2. Pursuant to an enforceable, irrevocable contract, G guarantees all extensions of credit by Conservative Bank to B that may be made before December 31. *Pursuant to the contract, Conservative Bank may assign its rights under the contract to any other bank but, upon assignment, G has the right to terminate the guaranty with respect to subsequent extensions of credit*. On October 1, Conservative Bank assigns all its rights under the contract to Risktaking Bank. As its name suggests, Risktaking Bank is more likely to make risky loans than is Conservative Bank. Conservative Bank and Risktaking Bank do not inform G of the assignment, and have reason to know that G is unaware of it. G is discharged from liability for loans made by Risktaking Bank to B until G learns of the assignment. After that time, G may protect its interests by terminating the guaranty with respect to subsequent extensions of credit.

*Id.* cmt. a (emphases added).

We find section 47 clear and persuasive as to Indiana law. A surety may terminate its surety agreement based on subsequent defaults of the debtor only if the surety's contract reserved the right to terminate the agreement for those specified acts. Here, Devlin's Mortgage reserved no such right and specified no such acts that would operate to terminate his surety agreement. *See* Appellee's App. Vol. 2, pp. 113-22. Instead, Devlin merely seeks to second-guess how Brendan and the Bank managed their relationship following the initial issuance of the loan. We think Devlin's arguments, if adopted, would undermine good-faith dealings between lenders and debtors and would empower sureties to litigate any subsequent action of a debtor as "misconduct" entitling the surety to discharge.

In sum, we do not believe Devlin's position is consistent with Indiana law. We hold that, for a surety to seek to terminate his surety agreement based on subsequent defaults of the debtor on the underlying obligation or subsequently incurred duties of debtor, the surety must have reserved the right in his surety agreement to terminate upon the occurrence of any such specified event. That did not happen here, and we therefore affirm the trial court's judgment on this issue as well.

## Conclusion

For all of these reasons, we affirm the trial court's judgment to foreclose on the Mortgage and its amended in rem judgment against Devlin's property.

Affirmed.

May, J., and Vaidik, J., concur.


ATTORNEY FOR APPELLANT

Don R. Hostetler
Hostetler Law LLC
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE

Paul D. Vink
Nathan T. Danielson
Bose McKinney & Evans LLP
Indianapolis, Indiana