

I N  T H E

# Court of Appeals of Indiana

The Morel Company, LLC,

*Appellant-Plaintiff*

v.

Sizewise Rentals, LLC,

*Appellee-Defendant*



FILED

May 29 2026, 10:34 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

---

May 29, 2026

Court of Appeals Case No.
25A-PL-937

Interlocutory Appeal from the Ripley Circuit Court

The Honorable Jeffrey Sharp, Special Judge

Trial Court Cause No.
69C01-2305-PL-000005

---

**Opinion by Judge Felix**

Judge Altice concurs.
Chief Judge Tavitas dissents with a separate opinion.


**Felix, Judge.**

## Statement of the Case

In 2015, The Morel Company, LLC ("Morel") and Sizewise Rentals, LLC ("Sizewise") entered into a five-year distribution agreement whereby Morel would design and manufacture a medical device for hospital bedframes. Sizewise would purchase the devices at a discounted price, rent them to healthcare facilities, and pay Morel a "Rental Rate Share." Five years later, Sizewise communicated its intention to let the agreement expire before it renewed or extended. The parties disputed whether the agreement permitted Sizewise to do so or instead extended automatically. The trial court denied both parties' motions for summary judgment, prompting this interlocutory appeal. The parties raise two issues, which we restate as the following single issue: Whether the trial court erred by denying their respective motions for summary judgment.

We reverse.

## Facts and Procedural History

Morel is a medical device manufacturer whose principal product is an "automated patient repositioning device," Appellant's App. Vol. II at 96,

known as the "Hercules Patient Repositioner" (the "Hercules"), Appellant's App. Vol. VI at 127. The Hercules attaches to hospital bedframes and enables caregivers "to push a button to pull a patient up in bed." App. Vol. III at 112.

[4] Relevant for this appeal, Sizewise is a distributor of specialty medical equipment. Sizewise specializes in the "bariatric" market, Appellant's App. Vol. III at 10, which consists of medical devices tailored to obese patients. One line of Sizewise's business was the sale and rental of "bariatric bedframes," *id.*, which are several inches wider than standard 36-inch hospital bedframes. Sizewise charged customers (e.g., hospitals, care centers, etc.) a daily rental rate for use of the bedframes.

[5] In 2014, Sizewise representatives discovered the Hercules at a trade show and became interested in adding it to Sizewise's portfolio of products. At the time, the Hercules was only designed to fit standard hospital bedframes. Sizewise was interested in working with Morel to distribute the Hercules in "bariatric form" to fit bariatric bedframes. Appellant's App. Vol. V at 16. On February 16, 2015, after several draft proposals, Morel and Sizewise signed a final distribution agreement (the "Agreement").

[6] Under the Agreement, Morel would design and supply Hercules units for bariatric bedframes, and Sizewise would have five years of exclusive distribution rights. Sizewise could purchase the units either (1) for resale or (2) to rent to Sizewise's customers. Units purchased for resale were priced at $4750.00, and units purchased to rent were priced at $2650.00. The latter price

was discounted because Sizewise would pay Morel a "Rental Rate Share" based on each rented unit. Appellant's App. Vol. VI at 133. The Rental Rate Share was initially $13.00 for each day that a unit was rented, with provisions for adjustment after the first three years. Sizewise was also required to furnish Morel with reports regarding sales activities and market data, as well as "daily information on [units] rented and invoiced." *Id.* at 134.

The Agreement contained several key provisions regarding the term and termination thereof, including the following:

## ARTICLE 1

### APPOINTMENT AS DISTRIBUTOR

* * *

1.2     Term.  The term of this Agreement (the "Term") shall commence on the Effective Date [February 16, 2015], and unless terminated earlier under Article 11 [the Termination Section], shall remain in full force and effect until the fifth anniversary of the Effective Date, as may be extended only as provided in this Section 1.2 or by the written agreement of the Parties.  Beginning on the fifth anniversary, the Term will be automatically extended for additional two-year (2) periods, subject to the early termination provisions contained in Article 11.

Appellant's App. Vol. VI at 127–28.

## ARTICLE 11

<u>TERMINATION</u>

11.1   <u>Termination</u>. A Party shall have the right to terminate this Agreement at any time by giving written notice to the other Party upon the occurrence of any of the following events:

    a. a material default of this Agreement by the other Party that is not corrected within thirty (30) days after receiving written notice from the non-defaulting Party with respect to such default; or

    b. any determination, filing, judgment, declaration, notice, appointment of receiver or trustee, or other events under any law applicable to a Party indicating the insolvency or bankruptcy of such Party; or

    c. any change of control of the other Party which shall occur if another entity which is not a Party to this Agreement acquires, directly or indirectly, at least fifty percent (50%) of the voting equity (or other comparable interest for an entity other than a corporation) of such other Party.

11.2   <u>Minimum AIU and Purchase Requirements</u>. [Morel] shall have the right to terminate this Agreement at any time by giving written notice to [Sizewise] in the event that [Sizewise] has failed to meet each minimum Average in Use (AIU) volume threshold . . . .

*Id.* at 140. The Termination Section also contemplated a "[two]-year tail" provision, Appellant's App. Vol. III at 43, which provides, "If [Sizewise]

terminates the Agreement, . . . [Morel] shall have the right to continue to be paid the Rental Rate Share . . . for twenty-four (24) additional months from the date this Agreement is terminated," Appellant's App. Vol. VI at 140–41.

[8] After approximately five years, Sizewise was not meeting the AIU volume requirements and was facing pricing pressure for its bedframes. Morel did not wish to terminate the Agreement because, although Morel "wanted the performance to be better," the Agreement was "still generating some revenues" and the revenue was growing. Appellant's App. Vol. IV at 12. Morel, however, determined that it would not renew Sizewise's exclusive distribution rights.

[9] On February 13, 2020—three days before the Agreement's fifth anniversary— Sizewise's Chief Executive Officer ("CEO") Brian Frickey sent a letter to Morel's CEO Bill Hillenbrand acknowledging an end to the exclusivity rights and stating that Sizewise wished to let the Agreement "expire" without the "2[-] year automatic renewal"[1] taking effect. Appellant's App. Vol. VII at 217. The day after the fifth anniversary, Hillenbrand sent a letter in response to Frickey, stating that the Agreement already "automatic[ally] renew[ed]" and that because Sizewise did not indicate it wished to terminate the Agreement pursuant to the Termination Section, the Agreement remained "in force." *Id.* at

---

[1] For clarity, although the parties tend to use "renewed" or "renewal," *e.g.*, Appellant's Br. at 6; Appellee's Br. at 8, the Agreement uses "extended," Appellant's App. Vol. VI at 127. We will use "renew" when quoting the parties but otherwise use "extend" and variations thereof.

220. Believing the Agreement had terminated, Sizewise continued to make Rental Rate Share payments to Morel through February 2022 pursuant to Sizewise's interpretation of the two-year tail provision under Section 11.3(e).

In October 2021, Sizewise was acquired by Agiliti, a medical equipment management company. Sizewise thereafter operated as an "autonomous entity . . . wholly owned by Agiliti." Appellant's App. Vol. VI at 13. Following the acquisition, Morel declined to negotiate a new contract with Agiliti, taking the position that its "contract with Agiliti remains in place as it did with Sizewise." Appellant's App. Vol. VIII at 125. Once the two-year tail period ended, Sizewise ceased making Rental Rate Share payments to Morel but continued to rent out its existing inventory of Hercules units. [2]

In May 2023, Morel filed a complaint against Sizewise alleging, as relevant here, that the Agreement was still in effect, Sizewise breached the Agreement by continuing to rent Hercules units but failing to pay Morel the Rental Rate Share, and Sizewise was unjustly enriched. [3] Both parties filed motions for summary judgment.

At the trial court, Morel argued that despite Sizewise's letter, the Agreement remained in effect because it "automatically renewed" in February 2020, 2022,

[2] It appears that in March 2022, Morel delivered several additional Hercules units to Sizewise, which Sizewise had ordered in December 2021.

[3] Sizewise also asserted counterclaims, which are not relevant to this appeal.

and 2024, as Sizewise did not "rely [on] or cite to any provision in the contract that would permit termination." Appellant's App. Vol. II at 50. Morel also argued that the agreement was not a "perpetual" contract, *id.* at 52, because it included specific termination provisions. In its motion for summary judgment, Sizewise argued that the Agreement permitted Sizewise to "opt out of renewal" after the fifth anniversary. Appellant's App. Vol. IX at 3. Sizewise argued that if it could not so opt out, the Agreement would be rendered a perpetual contract notwithstanding its termination provisions because the provisions are "permissive." *Id.* at 4.

[13] The trial court denied both motions for summary judgment on the grounds that "disputed issues of material fact" remained. Appellant's App. Vol. II at 20. On May 15, 2025, we accepted jurisdiction of Morel's interlocutory appeal of that ruling, and this appeal ensued.[4]

## Discussion and Decision

### The Trial Court Erred by Denying Summary Judgment in Favor of Morel

[14] This is an appeal of an order denying the parties' summary judgment motions. We review summary judgment decisions de novo, *Gierek v. Anonymous 1*, 250 N.E.3d 378, 384 (Ind. 2025) (citing *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind.

---

[4] On March 23, 2026, we held oral argument in this case at Notre Dame University in South Bend, Indiana. We thank all those in attendance for their attentiveness and hospitality, and we thank counsel for both parties for the quality of their advocacy.

2014)), which means we apply the same standard as the trial court, *Wohlt v. Wohlt*, 245 N.E.3d 611, 615 (Ind. 2024) (citing *Red Lobster Rests. LLC v. Fricke*, 234 N.E.3d 159, 165 (Ind. 2024)). Summary judgment is proper only "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C).

[15] The parties' arguments require interpretation of the Agreement. Contract interpretation is a question of law that we review de novo. *Thomas v. Valpo Motors, Inc.*, 258 N.E.3d 236, 239 (Ind. 2025) (citing *Land v. IU Credit Union*, 218 N.E.3d 1282, 1286 (Ind. 2023)). "Summary judgment is 'especially appropriate' in cases of contract interpretation 'because the construction of a written contract is a question of law.'" *Id.* at 240 (quoting *N.H. Ins. Co. v. Ind. Auto Ins. Plan*, 176 N.E.3d 514, 521 (Ind. Ct. App.), *trans. denied*, 178 N.E.3d 796) (Ind. 2021)).

[16] When this court interprets a contract,

> we ascertain the intent of the parties at the time the contract was made, as disclosed by the language used to express the parties' rights and duties. We look at the contract as a whole . . . and we accept an interpretation of the contract that harmonizes all its provisions. A contract's clear and unambiguous language is given its ordinary meaning. A contract should be construed so as to not render any words, phrases, or terms ineffective or meaningless.

*Ryan v. TCI Architects/Eng'rs/Cont'rs, Inc.*, 72 N.E.3d 908, 914 (Ind. 2017) (internal citations omitted).

[17] Last, in interpreting the Agreement, we must determine if its language is ambiguous. "If the contract's terms are unambiguous, then they are conclusive of the parties' intent, and courts give the contract its plain meaning." *Wohlt*, 245 N.E.3d at 616 (citing *Decker v. Star Fin. Grp.*, 204 N.E.3d 918, 920–21 (Ind. 2023); *Ryan v. Ryan*, 972 N.E.2d 359, 364 (Ind. 2012)). On the other hand, if a contract is "subject to more than one reasonable interpretation," the contract is ambiguous. *Wohlt*, 245 N.E.3d at 616 (citing *G&G Oil Co. of Ind., Inc. v. Cont'l W. Ins. Co.*, 165 N.E.3d 82, 87 (Ind. 2021)). When a contract is ambiguous, "its interpretation is no longer a question of law but one of fact." *Id.* (citing *First Fed. Sav. Bank of Ind. v. Key Mkts., Inc.*, 559 N.E.2d 600, 604 (Ind. 1990)). The parties' mere disagreement regarding interpretation of the contract does not necessarily render the contract ambiguous. *Id.* (citing *G&G Oil Co. of Ind.*, 165 N.E.3d at 87).

[18] We first address the parties' arguments regarding whether the Agreement permitted Sizewise to opt out of an extension of the Term. We conclude that it did not. We then address Sizewise's argument that if it could not opt out of extension of the Term, the Agreement must be construed as a perpetual contract that could be terminated at will. We conclude that the Agreement is not a perpetual contract and was not terminable at will because the parties contemplated specific circumstances that would terminate their obligations.

We thus hold that the trial court erred by not granting summary judgment in favor of Morel.

### a. The Agreement unambiguously did not permit Sizewise to opt out of extension of the Term

[19] The parties disagree about whether the Agreement permitted Sizewise to opt out of an extension of the Term upon the Agreement's fifth anniversary. Both parties claim the Agreement unambiguously supports their position.

[20] The Term Section of the Agreement provides as follows:

> 1.2    Term.  The term of this Agreement (the "Term") shall commence on the Effective Date [February 16, 2015], and unless terminated earlier under Article 11 [the Termination Section], shall remain in full force and effect until the fifth anniversary of the Effective Date, as may be extended only as provided in this Section 1.2 or by the written agreement of the Parties.  Beginning on the fifth anniversary, the Term will be automatically extended for additional two-year (2) periods, subject to the early termination provisions contained in Article 11.

Appellant's App. Vol. VI at 127–28.

[21] In the first sentence, the plain language indicates that the Term could be extended either by Section 1.2, which provides for automatic extension, or by separate written agreement of the parties.  Appellant's App. Vol. VI at 127.  The parties intended that if they did not reach a written agreement regarding extension of the Term—and perhaps modify other provisions as well—the Term would automatically extend for two years as provided in Section 1.2, but

the Term would extend either way. The use of "may" does not indicate, as Sizewise contends, that a party could unilaterally choose not to extend the Agreement at all. Such an interpretation might lead to absurd results. For instance, Sizewise could continue renting Hercules units it had acquired near the end of the fifth anniversary at the rental-rate price without paying Morel the Rental Rate Share thereafter.

[22] In the second sentence of the Term Section, the Agreement unambiguously provides for automatic extension following its fifth anniversary, with that extension being subject to the Termination Section. Thus, unless the parties reached a separate written agreement, the Agreement would automatically extend unless the Termination Section were triggered beforehand. The Agreement nowhere mentions an additional right to opt out of an extension. To hold that the Agreement created such a right, we would be inserting into the Agreement language "not agreed upon by the parties." *Lake Imaging, LLC v. Franciscan All., Inc*, 182 N.E.3d 203, 211 (Ind. 2022) (citing *Broadbent v. Fifth Third Bank*, 59 N.E.3d 305, 311 (Ind. Ct. App. 2016), *trans. denied*).

[23] Sizewise nevertheless argues that the Agreement is a five-year "*term of years* contract," Appellee's Br. at 27 (emphasis in original), and that Sizewise could "opt out of the otherwise automatic renewal" after those five years elapsed, *id.* at 20. Said another way, Sizewise could let the Agreement "expire" on its fifth anniversary, and Sizewise would not need to "meet the requirements" of the Termination Section to do so. *Id.* at 20. Sizewise marshals several arguments in support of its interpretation, which we address in turn.

**Meaningless "Term."**   First, Sizewise argues that if it "could not opt out of the renewal of the Term," and the Agreement "could *only* be terminated" pursuant to the Termination Section, then "defining the Term is meaningless." Appellee's Br. at 21 (emphasis in original).   In other words, why set an initial term of five years when extension is automatic?   Sizewise further points out two sections of the Agreement, Sections 4.4[5] and 4.5,[6] which are "triggered by the renewal or extension of the term."   Appellee's Br. at 21.   Sizewise argues that "there is no need for such a structure if the renewal is mandatory in perpetuity." *Id.*

The language of the Agreement—including in both the Term and Termination Sections—reflects the arms-length bargained-for exchange of two sophisticated business entities after several rounds of negotiation.   We presume the Agreement reflects "the parties' freely bargained agreement." *Hartman v. BigInch Fabricators & Constr. Holding Co., Inc.*, 161 N.E.3d 1218, 1221 (Ind. 2021) (citing *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012)).   Contrary to Sizewise's argument, automatic extension does not render the Term

---

[5] Section 4.4, governing "Transfer Pricing," provides, "For each extension period of the Term, beginning with the fifth anniversary of the Effective Date, the per-unit transfer price shall continue to remain static and unchanged from the immediately preceding period," subject to certain conditions.   Appellant's App. Vol. VI at 132.

[6] Section 4.5, governing the Rental Rate Share, provides that "[u]pon the first date of each extension of the Term, beginning with the fifth anniversary," the Rental Rate Share would be automatically increased if Sizewise's pricing has increased "compared with . . . the most recent previous anniversary date."   Appellant's App. Vol. VI at 133.

meaningless. As the first sentence of Section 1.2 indicates, the two-year automatic extension was merely the default scenario in the event the parties did not reach a separate written agreement regarding extension. And as Sections 4.4 and 4.5 indicate, each extension triggers potential changes in the parties' obligations.

[26] **Automatic vs. Perpetual Extension.** Second, Sizewise argues that "the mere use of the term 'automatically' does not obligate Sizewise to renew the . . . Agreement in perpetuity." Appellee's Br. at 22. Sizewise cites this court's decision in *Cook v. Adams County Plan Commission*, 871 N.E.2d 1003, 1004 (Ind. Ct. App. 2007), *trans. denied*, which is not only distinguishable, but hardly relevant to Sizewise's purported opt-out right. In *Cook*, the issue was whether a lease qualified as "long term" pursuant to a county zoning ordinance, 871 N.E.2d at 1004, which is not at issue here. Moreover, in *Cook*, the lease in question provided for a one-year term that "shall be automatically renewed for each successive year thereafter unless notice of cancellation is given by certified mail at least 180 days before the anniversary date hereof." *Id.* at 1004–05. The Agreement here, in contrast, does not expressly authorize a party to unilaterally decline to extend it.

[27] **Termination Section as the Exclusive Means of Termination.** Third, Sizewise argues that the Agreement authorized Sizewise to opt out of extension because the Agreement does not provide that the Termination Section constitutes "the *only* or the *exclusive* way" for the Agreement to be ended. Appellee's Br. at 23 (emphasis in original). Sizewise points out several other provisions in the

Agreement that "refer to a party's right . . . being exclusive or otherwise specifically limited,"[7] *id.*, and relies on *Simon Property Group, L.P. v. Michigan Sporting Goods Distributors., Inc.*, 837 N.E.2d 1058 (Ind. Ct. App. 2005), *trans. denied*, to show this omission was intentional.

[28] In *Simon*, a shopping mall tenant claimed that the landlord breached the lease by leasing space to one of the tenant's competitors, and the tenant sought damages and injunctive relief. 837 N.E.2d at 1061–62. The section of the lease restricting the landlord's right to lease space to a competitor authorized the tenant to pay reduced rent in the event of the landlord's breach but did not mention other remedies. *Id.* at 1071. In contrast, other provisions of the lease referenced "other rights and remedies in addition to" a specifically-provided remedy. *Id.* at 1072. On appeal, this court held that the tenant's remedy was

---

[7] The provisions Sizewise points out are as follows:

- Article 5: "SUCH WARRANTIES PROVIDE THE *EXCLUSIVE REMEDIES* FOR ANY NON-CONFORMITY OR DEFECT IN ANY [of Morel's] PRODUCTS." Appellant's App. Vol. VI at 135 (capitalization in original, italic emphasis added).
- Section 4.1: "[A]mendments to any of the terms and conditions of this Agreement or adding terms that are not included in this Agreement *may only be made by written acceptance by [Morel]*." *Id*. at 132 (italic emphasis added).
- Section 7.3: "In the event (*and only in the event*) that a Party's obligations under Section 7.1 above result from, arise out of, or relate to a claim for which both Parties have liability . . . , each Party shall be liable to pay only its Proportionate Share of the Loss associated with such Joint Claim." *Id*. at 138 (italic emphasis added).
- Section 12.5: "No change, modification, or amendment of this Agreement shall be valid or binding on the Parties *unless such change or modification shall be in writing* signed by the Party or Parties against whom the same is sought to be enforced." *Id*. at 142 (italic emphasis added).
- Section 12.13: "*Except only as specifically provided otherwise in this Agreement*, each Party shall bear all fees and expenses incurred by it in performing its obligations under this Agreement." *Id*. at 143 (italic emphasis added).

limited to paying reduced rent because "[i]f the parties had intended . . . to include other rights and remedies in addition to the reduced rent, other sections of the Lease indicate the parties knew how to include such language." *Id*. at 1072–73.

[29] Contrary to Sizewise's position, *Simon* supports our interpretation that the Agreement does not provide an opt-out right. The Termination Section lists several conditions that would permit termination but does not mention an opt-out right. If the parties intended to include such a right, they would have done so.

[30] **"Early Termination."** Fourth, Sizewise argues that the use of "early" and "earlier" before "termination" in two sections of the Agreement means the Termination Section applies only to "*early* terminations—*i.e.*, terminations before the end of the Term." Appellee's Br. at 25 (emphasis in original). Said another way, "a party can, under other circumstances, opt out of the renewal and allow the . . . Agreement to expire at the end of its term—a termination that is, by definition, not 'early.'" *Id.* Sizewise further argues that if the Termination Section "was the only way to terminate the Distribution Agreement," the use of "early" would be "meaningless." *Id.*

[31] "Early" or "earlier" is used before "termination" in two sections of the Agreement. Section 1.2 provides that the Term would last through the fifth anniversary "unless terminated *earlier*" under the Termination Section. Appellant's App. Vol. VI at 127 (emphasis added). The Term section further

provides that on the fifth anniversary, the Term will automatically extend "subject to the *early* termination provisions" contained in the Termination Section. *Id.* at 127–28 (emphasis added). Section 1.4 governing "Exclusivity" defines the period of exclusivity as "the period beginning on the Effective Date and ending on the earliest to occur of the fifth anniversary of the Effective Date, the *earlier* termination of this Agreement under [the Termination Section], or the date written notice is given" that Sizewise's volume requirements have not been met. *Id.* at 128 (emphasis added).

[32] The Termination Section itself provides that a party has the right to terminate the Agreement "at any time" when a triggering condition is met. Appellant's App. Vol. II at 140. The use of "early" and "earlier" merely signify that the parties contemplated the automatic extensions would not occur and the period of exclusivity would not be completed if the Agreement were terminated— pursuant to the Termination Section—beforehand.

[33] **Two-Year Tail Provision.** Fifth, Sizewise argues that the two-year tail provision under Section 11.3(e) supports the existence of an opt-out right. This section provides, "If [Sizewise] terminates the Agreement, . . . [Morel] shall have the right to continue to be paid the Rental Rate Share . . . for twenty-four (24) additional months from the date this Agreement is terminated." Appellant's App. Vol. VI at 141. Sizewise argues that this section supports the existence of an opt-out right because it (1) anticipates compensation for Morel if Sizewise declines to extend the Agreement and (2) allows Morel to "*more* than recoup the difference in price between re-sale units and rental units."

Appellee's Br. at 28 (emphasis in original). For example, at a Rental Rate Share of $13.00 per day, Morel would recoup the $2,100.00 difference between the for-sale and for-rent prices in 162 days.

[34] We disagree with Sizewise's interpretation of Section 11.3(e) as a right to opt-out for two reasons. First, the section appears in the Termination Section and uses "terminates" and "terminated." Appellant's App. Vol. VI at 141. This indicates Section 11.3(e) refers to termination under the Termination Section, not a separate opt-out right. Second, under Sizewise's interpretation, even if Morel could recoup the difference between the for-sale and for-rent unit prices, Morel would not reap the potential profits from units rented after the two-year tail period ended. Sizewise would be permitted to purchase a discounted Hercules unit at the end of the fifth anniversary, then opt out of renewing the Agreement. Thereafter, Sizewise could continue to rent out that unit for many years but only pay Morel the Rental Rate Share payments for two years. While this situation was contemplated, it is only permitted when Sizewise terminates the Agreement. Sizewise is only permitted to terminate the Agreement pursuant to Section 11, and none of the conditions have transpired to allow Sizewise to do so. In other words, it was contemplated that Morel will lose profits after the two-year tail, but only if Morel's actions (i.e., default, bankruptcy, ownership change) permitted Sizewise to terminate the Agreement. Sizewise simply wanting to not extend the Agreement was not a contemplated reason for Morel to lose profits and the benefit of its bargain.

In sum, the Agreement is unambiguous and does not allow Sizewise to opt out of extension. The Agreement extends unless it is terminated beforehand pursuant to the Termination Section, which did not occur here. Sizewise thus remains bound by the Agreement.

### b. The Agreement is not a perpetual contract that could be terminated at will

Sizewise argues in the alternative that if it cannot opt out of the Agreement prior to extension, the Agreement must be a "perpetual" contract that is "therefore terminable at will." Appellee's Br. at 28. Sizewise's argument requires us to answer two separate questions: First, whether the Agreement is a perpetual contract and second, whether the Agreement is terminable at will.

When a contract provides for continuing obligations but contains no termination date, our cases reveal three categories into which the contract may fall. The first category is that of "perpetual" contracts. *Cook*, 871 N.E.2d at 1007 (quoting *Geyer v. Lietzan*, 230 Ind. 404, 409, 103 N.E.2d 199, 201 (Ind. 1952), *trans. denied*). Such contracts can theoretically "last for centuries." *Id.* at 1008; *see also Geyer*, 103 N.E.2d at 201; *Black v. Ervin*, 132 Ind. App. 470, 473–74, 132 N.E.2d 142, 143–44 (1961) (holding parties intended to create a perpetual lease when the lease provided for the party in interest "to have and to hold" the property "so long as rent hereafter stipulated, is paid" and the party in interest had since been in possession of the property for more than 35 years without dispute). Due to their unending nature, "the law does not favor" perpetual contracts, and a contract will be construed so as to avoid creating

perpetual obligations unless "it clearly so provides, in language so plain and unequivocal as to leave no doubt that such was the intention and purpose of the parties." *Cook*, 871 N.E.2d at 1007 (quoting *Geyer*, 103 N.E.2d at 201).

[38] Absent clear intent by the parties to create a perpetual contract, the contract falls into either the second or third contract category. Determining into which of these categories the contract falls depends on whether the contract contains "a provision that sets out a condition which would terminate" a party's obligations. *Marksill Specialties, Inc. v. Barger*, 428 N.E.2d 65, 69 (Ind. Ct. App. 1981).

[39] If the contract lacks such a termination provision, it falls into the second category and is "terminable at will." *See Marksill*, 428 N.E.2d at 69 (citing *House of Crane v. H. Fendrich, Inc.*, 146 Ind. App. 478, 482, 256 N.E.2d 578, 579 (1970); *Monon R.R. v. N. Y. Cent. R.R. Co.*, 141 Ind. App. 277, 288, 227 N.E.2d 450, 456 (1967)); *see also City of E. Chicago v. E. Chicago Second Century, Inc.*, 908 N.E.2d 611, 623 (Ind. 2009) (noting that "a contract containing no specific termination date" will not be construed as to provide for perpetual obligations but will instead be construed to be "terminable at will" with a "reasonable" amount of time given for "discharge" of performance) (citing *House of Crane*, 256 N.E.2d 578, 579 (1970)). For example, in *House of Crane*, the court held that a contract that "did not specify a definite time or prescribe conditions which would determine the duration of the contract," 256 N.E.2d at 579, was terminable at will, *id.* at 580.

[40] If, on the other hand, the contract does provide a condition that would terminate a party's obligations, the contract will often fall into the third category, in which case it is "terminable in accordance with its terms and not at the will of either party." *Marksill*, 428 N.E.2d at 69. In *Marksill*, the contract provided that a customer acquirer would secure new accounts, Marksill would pay a commission based on sales made, and the contract would remain "valid and payment shall continue as long as [the customer acquirer] sells any product to any company listed." 428 N.E.2d at 67. The court held that because the contract contained a provision under which Marksill's "obligations" would terminate—"the discontinuance of the sale of certain products" from the customer acquirer—the contract was only terminable in accordance with that provision. *Id.* at 69; *see also Made2Manage Sys., Inc. v. ADS Info. Sys., Inc.*, 2003 WL 21508235, at *6–7 (S.D. Ind. June 24, 2003) (citing *Marksill* and holding contract that contained specific termination provisions was neither a perpetual contract nor terminable at will); *Ent. USA, Inc. v. Mooreheard Commc'ns, Inc.*, 93 F. Supp. 3d 915 (N.D. Ind. 2015) (similar).

[41] Turning to the Agreement here, nothing indicates that the parties clearly intended it to be a perpetual contract. An entire portion of the Agreement was devoted to termination. *Marksill*, 428 N.E.2d at 69. The parties would not have included termination provisions if they intended the Agreement to be perpetual. *See id.*

[42] Moreover, regarding the Rental Rate Share specifically, it appears the parties intended this obligation to endure as long as Sizewise rented Hercules units to

its customers. This is not a perpetual obligation because Sizewise could end the obligation simply by choosing to stop renting such units.

[43] Sizewise argues that even if it chose to stop renting Hercules units, the Agreement would still be a perpetual contract because Sizewise would remain obligated to send Morel sales reports pursuant to Sections 3.1(g) and 4.12, although the reports would be "blank or have no content."[8] Appellee's Br. at 30. Section 3.1(g) requires Sizewise to furnish Morel with monthly "reports and information relating to the purpose of th[e] Agreement." Appellant's App. Vol. VI at 131. Section 4.12 requires Sizewise to provide Morel with reports "providing daily information on Repositioner Products rented and invoiced." Appellant's App. Vol. VI at 134.

[44] Regarding Section 4.12, at oral argument, Morel explained that if Sizewise was not renting Hercules units, "there's no reporting that needs to be done." Oral Argument at 42:05–42:11. Similarly, as for Section 3.1(g), Morel explained that the "purpose" of the Agreement was to "effectuate this distributor/supplier type relationship, i.e. the rental of" Hercules units, so if Sizewise was not renting Hercules units, "there is no information to report." *Id.* at 42:40–43:07.

---

[8] Sizewise also argues the Agreement would still be perpetual because Morel would remain obligated to provide Sizewise notice before agreeing to sell all or substantially all of Morel's assets pursuant to Article 10 of the Agreement. This is not a perpetual obligation on Morel's part because it only arises if and when a certain event occurs.

[45]   Having concluded that the Agreement is not perpetual, we must determine whether it is terminable at will or only in accordance with its terms. Sizewise relies on *Jesperson v. Minnesota Mining and Manufacturing Co.*, 700 N.E.2d 1014, 1016 (Ill. 1998), which involved a distribution agreement whereby Jesperson would sell auto parts from Trim-Line, a manufacturer. The agreement provided it would "continue in force indefinitely" unless terminated in accordance with its termination provision, which stated that Trim-Line "may" terminate the agreement in the event of Jesperson's "failure to reasonably promote Trim–Line's products," breach of the agreement, failure to make a payment, death, bankruptcy, insolvency, or sale or transfer of Trim-Line's rights without Trim-Line's consent. *Id.*

[46]   Minnesota Mining and Manufacturing ("3M") later acquired Trim-Line and sought to terminate the agreement. *Jesperson*, 700 N.E.2d at 1016. Jesperson argued 3M could not terminate the agreement at will but only in accordance with its termination provision. *Id.* The Illinois Supreme Court held the agreement was terminable at will for two reasons. *Id.* First, the termination provision was "permissive and equivocal; a party 'may' terminate for the stated grounds—the clear inference being that those grounds are not the sole or exclusive basis for termination." *Id.* Second, the provision listed events that were "instances of material breach, and any contract is terminable upon the occurrence of a material breach." *Id.* (citing *Trient Partners I Ltd. v. Blockbuster Ent. Corp.*, 83 F.3d 704, 709 (5th Cir. 1996)).

[47] Given the nature of the Agreement here, *Jesperson* is not persuasive. Unlike the distributor in *Jesperson*, Sizewise controls its own destiny because it can end its obligation to pay the Rental Rate Share by choosing not to rent Hercules units. In this sense, the Agreement is closer to the contract in *Marksill*, which only obligated Marksill to pay commissions for sales made. *Marksill*, 428 N.E.2d at 69. As in *Marksill*, it would make little sense for the Agreement to be terminable at will given the nature of the parties' business relationship.

[48] In fact, holding that the Agreement is terminable at will would undermine the financial incentives underlying the Rental Rate Share structure. Sizewise benefited from a reduced price for rental units compared to units purchased outright. Morel took on the risk that this difference would not be recouped in exchange for the potential reward that collecting the Rental Rate Share payments over time proved more profitable. If Sizewise could purport to terminate the Agreement at will but continue renting Hercules units without paying Morel the Rental Rate Share, it would disrupt the risk-reward exchange for which the parties bargained.[9]

[49] In sum, the Agreement unambiguously does not provide Sizewise with the right to unilaterally opt out of extension of the Term, the Agreement is not a perpetual contract, and Sizewise could not terminate the Agreement at will.

---

[9] Additionally, although *Jesperson* characterized the listed termination events as all "instances of material breach" for which any contract could be terminated, 700 N.E.2d at 1016, the same is not true here. Unlike in *Jesperson*, the Agreement listed a "change of control" of the other party as grounds for termination, Appellant's App. Vol. VI at 140, and that would not necessarily constitute a material breach.

The Agreement could only be terminated in accordance with its stated conditions, which did not occur. We therefore reverse the ruling of the trial court and direct the trial court to grant summary judgment in favor of Morel.

[50] Reversed.

Altice, J., concurs.
Tavitas, C.J., dissents with a separate opinion.

ATTORNEYS FOR APPELLANT

Steven C. Coffaro
James E. Burke
Andrew B. Barras
Bryce J. Yoder
Keating Muething & Klekamp PLL
Cincinnati, Ohio

ATTORNEYS FOR APPELLEE

Christopher W. Madel
Madel PA
Minneapolis, Minnesota

Briana L. Clark
Dentons Bingham Greenebaum, LLP
Indianapolis, Indiana

**Tavitas, Chief Judge, dissenting.**

I respectfully dissent from the majority's conclusion that the Agreement here is unambiguous and that summary judgment should be granted to Morel. Although both parties argue that the Agreement is unambiguous, I disagree and conclude that the Agreement is subject to more than one reasonable interpretation and, thus, is ambiguous. Accordingly, I would affirm the trial court's denial of both parties' motions for summary judgment and remand for the trier of fact to determine the Agreement's intent.

Our "task is to determine and implement the parties' intent when they entered the contract." *Wohlt v. Wohlt*, 245 N.E.3d 611, 616 (Ind. 2024). We "start with the language of the parties' agreement." *Id.* "If the contract's terms are unambiguous, then they are conclusive of the parties' intent, and courts give the contract its plain meaning." *Id.* When reviewing an unambiguous written contract, we "look only to that document, staying within its four corners." *Id.* The interpretation of a contract is generally a question of law that is appropriate for summary judgment. *Id.*

"[I]f a contract's terms are ambiguous, inconsistent, or uncertain, its interpretation is no longer a question of law but one of fact." *Id.* In the case of an ambiguous contract, "the trier-of-fact must determine the facts required to construe the contract." *Id.* "[T]he factfinder must look outside the contract's four corners to parol (or extrinsic) evidence" to determine the intent of the parties. *Id.* "A contract is not ambiguous simply because the parties disagree

about the proper interpretation of its terms." *Id.* "Instead, for an ambiguity to exist, the contract must be subject to more than one reasonable interpretation." *Id.*

[54] The parties here disagree on the interpretation of the Agreement regarding the termination provisions. The Agreement provided:

> 1.2 <u>Term</u>. The term of this Agreement (the "<u>Term</u>") shall commence on the Effective Date [February 16, 2015], and **unless terminated earlier under Article 11 [the Termination Section], shall remain in full force and effect until the fifth anniversary of the Effective Date, as may be extended only as provided in this Section 1.2 or by the written agreement of the Parties**. Beginning on the fifth anniversary, the Term will be automatically extended for additional two-year (2) periods, **subject to the early termination provisions contained in Article 11**.

Appellant's App. Vol. VI at 127-28 (emphasis added).

[55] Section 11.1 permits termination only upon the occurrence of one of three specific events: (a) a material default not cured within thirty days of written notice; (b) insolvency or bankruptcy of a party to the contract; or (c) a change of control of a party. Section 11.2 additionally grants Morel the right to terminate the contract if Sizewise fails to meet certain minimum AIU and purchase requirements. It is undisputed that the conditions listed in Article 11 were not triggered.

The parties, however, disagree as to the interpretation of Section 1.2. Morel contends that, after the initial five-year term, the Agreement is automatically extended for additional two-year periods. According to Morel, because the Article 11 conditions were not triggered, Sizewise remained bound by the Agreement.

On the other hand, Sizewise argues that the Agreement was subject to a five-year term that "**may** be extended" and that Sizewise was, thus, allowed to decline the two-year renewals. *Id.* at 127 (emphasis added). Sizewise argues that Section 1.2 describes the Article 11 provisions as "earl[y]" termination provisions, implying that Article 11 applied only to terminations before the five-year term ended. *Id.* If a triggering event from Article 11 was the only way to terminate the Agreement, the word "earl[y]" in Section 1.2 would be meaningless. *Id.* Sizewise also argues that Morel's interpretation of the Agreement renders the five-year-term language meaningless and creates a perpetual agreement, which is terminable at will.

The Agreement was so poorly drafted that the provisions for termination are impossible to reconcile. Accordingly, I conclude the Agreement is ambiguous, and the trial court properly denied the parties' motions for summary judgment. The trier of fact should determine the intent of the parties regarding the Agreement. *See, e.g.*, *Rusnak v. Brent Wagner Architects*, 55 N.E.3d 834, 842 (Ind. Ct. App. 2016) (reversing the grant of summary judgment because the parties' agreement was ambiguous), trans. denied. For these reasons, I respectfully dissent.